IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division

_____
                                              )
**PHILIP LAYMAN**                             )
**104 Crest Avenue**                          )
**Glen Burnie, MD 21061**                     )
                                              )
              **Plaintiff,**                  )
                                              )
**v.**                                        ) **Case No. 1:12-cv-2860**
                                              )
**MET LABORATORIES, INC.**                    )
**914 W Patapsco Avenue**                     )
**Baltimore, MD 21230**                       )
                                              )
                                              )
                                              )
              **Defendant.**                  )
**Serve:**                                    )
**Abba David Poliakoff**                      )
**233 E. Redwood St.**                        )
**Baltimore, MD 21202**                       )
                                              )
                                              )
_____)

### CIVIL COMPLAINT FOR EQUITABLE
### AND MONETARY RELIEF AND DEMAND FOR JURY TRIAL

1.      Plaintiff, Philip Layman ("Layman") files this Complaint of retaliation in

violation of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h), and for wrongful termination in

violation of public policy against Defendant MET Laboratories, Inc. ("MET").

### INTRODUCTION

2.      MET terminated Layman, an engineer with close to twenty years of exemplary

service to the company because Layman made efforts to stop a violation of the False Claims Act

and refused to approve a product testing report that contained fraudulent data for reporting to the

1

United States Government.  In fact, if Layman approved the report, he would have encouraged

the United States military to purchase a product that did not meet testing standards or military

regulations, which in turn could have life threatening consequences.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this Complaint pursuant to

28 U.S.C. § 1331, because this is an action arising under the laws of United States, specifically,

the FCA.

4.      Venue in this district is appropriate pursuant to 28 U.S.C. § 1391 because MET

may be found in this district and because a substantial part of the acts or omissions that form the

basis of this Complaint occurred in this district.

5.      Venue in this division is appropriate because MET has its corporate headquarters

in this division.  It is also the division where a substantial part of the acts or omissions that form

the basis of this Complaint occurred.

## PARTIES

6.      Layman is domiciled in the state of Maryland.

7.      MET conducts business and has its corporate headquarters in this district.  MET is

an independent electrical testing and certification lab, specializing in testing various

technological products during pre-market development.  According to its website, MET provides

single-source testing in four laboratories located in Maryland, California, Texas, and through

wholly-owned China and Korea operations.

## FACTUAL ALLEGATIONS

8.      Layman is a 45 year-old resident of Maryland.

9.      MET employed Layman at its Baltimore headquarters from on or about October 1, 1991 through his termination on or about July 14, 2011.

10.     From 1991 to October 2006, Layman worked as a test engineer.  MET employs test engineers within four testing groups: telecommunications, electromagnetic compatibility compliance testing, product safety testing and certification, and environmental simulation testing.

11.     As a test engineer, Layman organized, scheduled, and performed product testing within MET's environmental simulation testing group.  Specifically, Layman performed product testing in MET's Environmental Simulation Lab ("ESL").

12.     Layman conducted a wide array of commercial and military product testing in the ESL.  The ESL allows test engineers to evaluate products in extreme environmental conditions. MET has several environmental simulation chambers and they are used to perform temperature, humidity, and vibration testing simultaneously.

13.     The test engineer monitored the testing to ensure that it was completed in accordance with not only the client's specifications, but also applicable state, federal, and military regulations.

14.     Layman collected and recorded the data and measurements from the tests that he performed in preparation for completing a final report concerning the results and overall conclusions of all the tests.

15.     Layman conducted and was responsible for completing final reports on products tested in earthquake, high altitude, and car crash simulations.  For example, Layman tested

cameras designed to be planted on the belly of jet aircraft and GPS antennas that were created in hopes of being mounted on 18 wheel trucks.  In essence, Layman carried out an assortment of tests to either make certain that a product would survive in its anticipated environment or to determine the effects a specific environment would have on a product.

16.     In or around October 2006, MET promoted Layman to the ESL Manager position.

17.     Layman supervised eleven people in his role as ESL Manager and was responsible for performing a wealth of tasks in the ESL.

18.     Layman scheduled and assigned test engineers to perform product testing in the ESL.

19.     Layman assisted clients in developing, organizing, and tailoring tests to be performed on a particular product.  Moreover, Layman identified potential problems with products and recommended to clients conducting the appropriate additional tests that would ensure a product was tested in compliance with the client's specifications.

20.     Layman researched and designed new testing capabilities for the environmental simulation chambers.  Layman attempted to develop new tests to make product testing more efficient.

21.     Furthermore, Layman often suggested a number of electrical or mechanical product design changes to a client after reviewing certain test results if a product did not meet a client's expectations.

22.     On occasion, Layman, like a test engineer, performed, measured, and recorded product testing in the ESL.

23.     Layman was also predominantly responsible for price quoting all ESL tests.  One of the approximately six MET sales executives would ask Layman to quote a price for testing a

prospective client's product.  Layman then reviewed the prospective client's request, calculated

an estimated cost to complete the testing, and forwarded the price quote to the sales executive.

24.     Finally, the ISO/IEC 17025 specifies the general requirements that a testing and

calibration lab must meet for the competence to carry out tests.   Per ISO/IEC 17025, Layman

supervised audits performed on the ESL equipment so that MET continued to maintain its

American Association for Laboratory Accreditation ("A2LA") certification.

25.     MET could not perform product testing deemed to be safe and accurate in the

ESL unless it maintained A2LA certification.

26.     Most of MET's clients required that its product be tested in an A2LA certified

lab.

27.     As the ESL Manager, Layman earned a base salary and various commission

payments totaling approximately $100,000 a year.

28.     In 2008, MET requested that Layman, along with a co-worker, Chuck Ritter

("Ritter"), recommend an outside company to design and build a dust chamber.

29.     A dust chamber is designed to simulate a desert environment.  Dust continuously

circulates around the chamber while the temperature, humidity, and dust concentration levels are

manipulated.

30.     Dust chambers are generally thirty feet long, thirty feet high, and thirty feet wide

(30' x 30' x 30').  The chamber is shaped like a donut.

31.      Layman determined that Air Dynamics Industrial Systems Corp. ("Air

Dynamics") should build and design MET's dust chamber.  Layman recommended to Troy

Franklin ("Franklin"), MET's Director, Environmental and Energy, that MET hire Air Dynamics

to build the dust chamber.

32.     Franklin served as Layman's direct supervisor.

33.     Franklin ignored Layman's recommendation and ultimately chose Educated Design & Development, Inc. ("Educated Design") to build the dust chamber.

34.     Educated Design built the dust chamber at a cost of approximately $30,000 less than Air Dynamics' estimate.

35.     Ever since it was built, the dust chamber was riddled with problems.  Namely, the optimal dust concentration and temperature level was extremely difficult to maintain in the chamber.

36.     MET engineers were constantly repairing the dust chamber in order for MET to properly and accurately test products.  The chamber often could not maintain the desired temperature or dust concentration level during product testing.

37.     In or around May 2011, MET received a contract from Windward Inc. ("Windward").  Windward was contracted by the United States Government to furnish pneumatic powered hydraulic pumping units ("Pumping Unit") for use by the United States military.

38.     The Windward contract with the United States Government called for the Pumping Unit to be subjected to, and pass, a MIL-STD-810E Blowing Dust Test.

39.     MET was subcontracted by Windward to subject the Pumping Unit to the MIL-STD-810E Blowing Dust Test in the MET dust chamber according to the specification standards.

40.     Layman did not know the specific use or the military client associated with the Pumping Unit.

41.     The Pumping Unit was approximately twelve inches long, eight inches high, and eight inches wide (12" x 8" x 8").

42.     Once identified as the subcontractor, the United States Government issued a "Letter of Delegation" to MET, which stated the testing requirements and assigned a Defense Contract Administration Services Quality Assurance Representative ("DCAS QAR") to serve as the military witness to approve the final testing report on the Pumping Unit.

43.     Projects that require a DCAS QAR witnesses tend to involve critical and significant military equipment contracted for sale to the United States Government.

44.     Elliot Jenkins ("Jenkins") served as the DCAS QAR on the Windward contract.

45.     The Windward contract and Letter of Delegation first required that the Pumping Unit be tested continuously for six hours at an ambient, or a low operating temperature, 23C, a relative humidity of less than 30%, and at a dust concentration level of 10.6 grams per cubic meter (g/m^3).  Furthermore, the Windward contract mandated that the Pumping Unit be tested for another continuous six hours at a high operating temperature, 49C, a relative humidity of less than 30%, and at a dust concentration level of 10.6 g/m^3.

46.     On May 24, 2011, Jason Newlon ("Newlon"), an MET test engineer, attempted to begin the Pumping Unit's low operating temperature testing in the dust chamber.  Both Jenkins and Glenn O'Rourke, Windward's President, observed the testing.

47.     However, the dust chamber was not able to maintain the proper dust concentration level of 10.6 g/m^3.  Specifically, the dust concentration kept dropping below the minimum concentration level, thereby preventing the Pumping Unit from being properly tested.

48.     Newlon continually struck the sides of the dust chamber with a rubber mallet and a two-by-four piece of wood in an attempt to knock the dust free from the chamber walls to increase the dust concentration level in the testing area of the chamber.

49.     Newlon could not generate the correct dust concentration level to accurately test the Pumping Unit.  Jenkins told Newlon to end the test approximately an hour after Newlon began striking the sides of the dust chamber.

50.     After stopping the test, Newlon and David Cunningham ("Cunningham"), an MET equipment mechanic, attempted to fix the dust chamber over the next three days, May 24 through May 26.

51.     Newlon and Cunningham were unable to repair the dust chamber so that the Pumping Unit could be accurately tested.

52.     Nevertheless, on May 27, Franklin directed Newlon to continue the Pumping Unit's low operating temperature testing in the dust chamber.  Neither a witness from Windward nor the DCAS QAR, Jenkins, was present for the May 27 tests, but Layman was present for the testing.

53.     Following the May 27 tests, Newlon discovered that Windward's pressure sensor, which is not a component of the Pumping Unit, was clogged with dust.  The pressure sensor was designed to connect to the Pumping Unit throughout both the high and low operating temperature tests in order to monitor the Pumping Unit for proper operation.  The pressure sensor was not part of the Pumping Unit being tested.

54.     The Pumping Unit could not be accurately tested if the pressure sensor was clogged with dust.

55.     On May 27, MET requested a replacement sensor from Windward.

56.     From May 28 through May 31, Newlon continued to make modifications and repairs to the dust chamber while he waited for the replacement sensor to arrive.

57.     On the afternoon of May 31, Newlon started the Pumping Unit's high operating temperature tests.  Like the low operating temperature testing, the appropriate dust concentration level could not be maintained for accurate readings.

58.     Further, the Pumping Unit did not maintain the requisite operating pressure level of 3900 pounds per square inch ("PSI") during the May 31 high operating temperature testing. The Pumping Unit did maintain the correct pressure level during the low operating temperature tests.

59.     Early in the high operating temperature testing, the Pumping Unit stopped reaching 3900 PSI, prompting Newlon to stop the testing to try to fix the Pumping Unit. However, Newlon was not able to fix the Pumping Unit so that it sustained the correct pressure level.

60.     Also on May 31, Layman emailed Franklin, as well as the rest of the ESL team, to notify Franklin of the ongoing issues with the dust chamber.

61.     Layman informed Franklin that the dust chamber was not cooling sufficiently, the humidity levels in the chamber were too high for the Pumping Unit tests, the dust monitors could not accurately measure the dust in the chamber, and that the proper dust concentration levels could not be maintained for both the low and high temperature Pumping Unit tests.

62.     Layman also stated that he would not approve results of any further tests conducted in the dust chamber until the chamber successfully completed three or four test runs with the requisite temperature, relative humidity percentage, and dust concentration level.

63.     On June 1, Newlon informed Layman and Franklin that the Pumping Unit was not maintaining the correct pressure level during the high operating temperature tests.

64.     Despite Layman's May 31 email and having actual knowledge that the Pumping Unit was malfunctioning, Franklin instructed Newlon to run the scheduled Pumping Unit tests on June 1.

65.     Also on June 1, Layman began investigating the matter of the Pumping Unit when he asked Franklin why he continued to test the Pumping Unit knowing that both the dust chamber could not maintain the required dust concentration level and that the Pumping Unit could not maintain the requisite pressure level.  Layman told Franklin that the Pumping Unit should not be tested until every problem that Layman identified in his May 31 email was resolved.

66.      Believing that Franklin intended to claim that the Pumping Unit complied with testing standards and all applicable military regulations, Layman told Franklin that "there is no way I [Layman] will put my name on this [Pumping Unit] report."

67.     In response, Franklin said that Layman "would not have [his] signature on anything before too long."

68.     The next day, June 2, Layman noticed that Newlon and another MET test engineer, Chris Bladen ("Bladen"), were preparing data from the Pumping Unit's tests in Microsoft Excel for the final test report.

69.     Layman continued his investigation of the Pumping Unit report when he asked Newlon and Bladen what they were doing with data from the Pumping Unit's tests.

70.     Newlon and Bladen admitted to Layman that they were compiling all the dust concentration readings for the two six hour test periods, averaging them, and passing this strait line data as the actual readings for the Pumping Unit's tests.

71.     In other words, despite the fact that the dust chamber did not maintain the required testing parameters (temperature, relative humidity percentage, and dust concentration level) for either the low or high operating temperature tests, Newlon and Bladen manipulated the test data to inaccurately convey that the Pumping Unit was in fact tested correctly.

72.     Layman told Newlon and Bladen that their actions constituted "faking data."

73.     Moreover, since the Pumping Unit was tested for a military client, Layman was responsible for making sure all tests were conducted in compliance with applicable military regulations, including MIL-STD-810E.

74.     MIL-STD-810E states that during testing, "the test variables (temperature, air velocity, and dust concentration) shall be continuously monitored during the test.  Humidity shall be verified just before or during each test."

75.     Therefore, calculating an average of the dust concentration readings from both the low and high operating temperature six-hour test periods, and presenting the averages as if the dust chamber continuously functioned at such conditions amounts to submitting fraudulent data for the Pumping Unit's final testing report.

76.     Upon further inquiry, Layman learned from Newlon and Bladen that they were following Franklin's direct instructions to calculate the data.

77.     After Layman's investigation of what Newlon and Bladen were doing with the Pumping Unit data, Layman disclosed his investigation about the testing and fraudulent calculation of the dust concentration level for the Pumping Unit's tests to Franklin.

78.     On June 2, Layman told Franklin that he discovered in the course of his investigation that the Pumping Unit was not accurately tested and that Newlon and Bladen improperly manipulated the dust concentration data, believing that reporting the data and

reporting that the Pumping Unit met all testing standards would be committing fraud in that Franklin actually knew that the data would be presented to the U.S. Government.

79.     Franklin ignored Layman's report, and four days later, on June 6, Franklin issued the Pumping Unit's ESL final report ("final report" or "Pumping Unit's final report") to Windward, containing the fraudulent data of which Franklin had actual knowledge of the falsity.

80.     The final report stated that the Pumping Unit met all testing standards, including the dust concentration requirement of MIL-STD-810E.

81.     According to the report, Newlon completed all the product testing and Jenkins, although he did not witness all of the Pumping Unit's tests, signed the final report as the military DCAS QAR.

82.     If Layman approved the final report, he would have effectively induced the United States military to purchase equipment that did not meet testing standards.

83.     Franklin signed the final report as MET's Lab Manager because Layman unequivocally refused to sign the fraudulent report.

84.     The final report listed May 27, June 1, and June 2 as the Pumping Unit's test days.  These days directly correspond to the dates that Newlon and other MET test engineers attempted to fix the dust chamber so that it could accurately test the Pumping Unit.

85.     Approximately two weeks after the final report was issued to Windward, Soonthorn Thamavong ("Thamavong"), a MET sales executive, approached Layman to ask him about the problems he was having with Franklin.

86.     Thamavong told Layman that during the last MET sales meeting, Franklin specifically directed the sales team to explain in an email to Franklin all the work-related problems that the sales executives had with Layman.

87.     MET's sales executives regularly interact with Layman in order to obtain price quotes for product testing.

88.     Thamavong told Layman that Franklin asked the sales team to send complaints that only involved Layman.

89.     On July 14, 2011, about a month after Layman learned that Franklin was soliciting complaints about him from the sales executives, Franklin told Layman that MET was "restructuring the department" and that Layman would be transferred to a newly created position, the Chief Technical Engineer.

90.     Franklin told Layman that the transfer, in part, was because of the complaints that he received from the sales executives.

91.     Franklin did not explain the contents of any complaint to Layman.

92.     Layman never received or was notified of any complaints that were filed against him by a MET sales executive.

93.      The purported transfer amounted to a constructive discharge.  The Chief Technical Engineer position entailed an approximate 15-20% pay cut, had no supervisory authority, and Layman would have to report to one of his former assistants, Allan Kimani.  The position allowed no opportunity for advancement and would require only a fraction of the work that was required of the ESL Manager position.

94.     MET intended to induce Layman's resignation when it demoted him to the Chief Engineer position.

95.     Despite the fact that Layman did not receive a negative performance evaluation during his tenure at MET and that the ESL department established an all-time billing record for the April-June 2011 quarter, MET constructively discharged Layman on or about July 14, 2011.

**FIRST CAUSE OF ACTION**
**(Retaliation in Violation of the False Claims Act, 31 U.S.C. § 3730(h))**

96.     Layman hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

97.     MET cannot retaliate against an employee who engages in protected conduct under the FCA, by taking lawful actions in furtherance of an FCA action, including investigation for, testimony for, or assistance in an action filed under the FCA.

98.     An employee has engaged in protected conduct when litigation under the FCA is a distinct possibility, when the conduct reasonably could lead to a viable FCA action, or when litigation is a reasonable possibility.

99.     An employee need not actually file a *qui tam* suit or even known about the protections of section 3730(h) to qualify for protection under the retaliation provision.

100.     An employee who characterizes the employer's conduct as illegal or fraudulent, or recommends that legal counsel become involved, engages in protected conduct.

101.     The Pumping Unit was not accurately tested in MET's dust chamber.  The chamber could not maintain the requisite temperature or dust concentration level throughout the two continuous six-hour test periods.

102.     On May 31, Layman notified Franklin via email that the dust chamber was not accurately testing the Pumping Unit.  Despite Layman's email, Franklin ordered the Pumping Unit tests to continue.

103.     On June 1, Layman discovered that the Pumping Unit was still not operating correctly (it was not making pressure) and that Franklin had ordered the testing to be performed anyway.  When Layman confronted Franklin on this decision, Layman told Franklin that he would not sign the Pumping Unit's final report unless the Pumping Unit was replaced in

14

accordance with MIL-STD-810E, Figure 4, Page 14 and the dust chamber was fixed and test-run.

Franklin responded that Layman "would not have [his] signature on anything before too long."

104.    After the Pumping Unit continued to be tested in the malfunctioning dust

chamber, Layman investigated and discovered that Newlon and Bladen, at Franklin's direction,

calculated inaccurate dust concentration data for the Pumping Unit's final report.  The data was

manipulated in order to erroneously demonstrate that the Pumping Unit met all testing standards.

105.    Layman knew that he would encourage the United States military to purchase a

product that did not meet testing standards if he were to approve the Pumping Unit's final report.

106.     Concerned about the legality of the report, Layman took part in further protected

conduct when he described his investigation of the contents of the fraudulent data contained

within the Pumping Unit's final report to Franklin.

107.    Layman, as the ESL Manager, signed the majority of final reports involving

products tested in the ESL.  However, since Layman refused to sign the Pumping Unit's final

report, Franklin signed it.

108.    The FCA "imposes civil liability on any person who knowingly uses a false

record or statement to get a false or fraudulent claim paid or approved by the Government, 31

U.S.C. § 3729(a) (2), and any person who conspires to defraud the Government by getting a false

or fraudulent claim allowed or paid, § 3729(a)(3)."  *Allison Engine Co., Inc. v. United States ex*

*rel. Sanders*, 553 U.S. 662, 665 (2008) (internal quotations omitted); *see also Rockwell Int'l*

*Corp. v. United States,* 549 U.S. 457, 463 (2007).

109.    An employee who internally reports false or fraudulent claims presented to the

government engages in protected activity.  *United States ex rel. Ackley v. Int'l Bus. Machines, et*

*al.*, 110 F. Supp. 2d 395, 400 (D. Md. 2000).

110.    Layman did not reveal an "ordinary critique" of the dust chamber or the Pumping

Unit's final report.  He "expressed his misgivings" about the final report because encouraging

the military to purchase a product that did not meet testing standards could have immeasurable

repercussions.  *United States ex rel. Elms v. Accenture LLP*, 341 Fed. App'x, 869, 874 (4th Cir.

2009).

111.    Based on the facts known to Layman at the time the Pumping Unit's final report

was issued to Windward, Layman's investigatory activities could reasonably have led to a viable

FCA action.

112.    A reasonable employee in the same or similar circumstances as Layman would

have believed that MET was defrauding the United States Government through the Pumping

Unit's final report.

113.    A reasonable employee in the same or similar circumstances as Layman would

have believed that he/she was being pressured to present a "false claim for payment" to the

government by approving the Pumping Unit's final report.  *See Harrison v. Westinghouse

Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999) (citing *United States v. Rivera*, 55 F.3d

703, 709 (1st Cir. 1995)).

114.    MET knew of Layman's protected activities because Layman disclosed to

Franklin that not only did Newlon and Bladen falsify data that would be presented to the United

States military, but that they did so at Franklin's instruction.  Layman engaged in further

protected conduct by stating to Franklin that he refused to sign or approve any report citing the

falsified dust concentration data.

115.    Approximately one month after Layman engaged in his protected activities, MET

retaliated against Layman by "restructuring the [ESL] department," which resulted in MET

transferring Layman to a position with no supervisory authority, no opportunity for advancement, and an approximate 15-20% pay decrease.

116.    MET would not have made its retaliatory decisions had Layman not engaged in the protected activities.

## PRAYER FOR RELIEF

Based on the foregoing, Layman respectfully requests that he be awarded the following relief against MET:

a.    Reinstatement or, in lieu thereof, full front pay, and benefits;

b.    Economic damages for lost wages and benefits, including two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the retaliation and reprisal;

c.    Compensatory (non-economic) damages, including but not limited to damages for emotional distress and loss of reputation;

d.    Punitive damages to punish MET for malicious acts of retaliation and to deter it from similar retaliatory conduct toward other employees; punitive damages to be determined at trial;

e.    Injunctive or equitable relief, as may be appropriate, to prevent further harm to others and the public caused by MET's retaliation against a whistleblower;

f.    Reasonable litigation costs, expert fees, and reasonable attorneys' fees; and

g.    Any other such relief that the Court may deem just and equitable.

## **<u>DEMAND FOR JURY TRIAL</u>**

Layman demands a trial by jury for any and all issues proper to be so tried.

Respectfully submitted,
*By Counsel*

/s/ David Scher
R. Scott Oswald (D. Md. Bar No. 25391)
David Scher (D. Md. Bar No. 17187)
The Employment Law Group, P.C.
888 17th Street, N.W., Suite 900
Washington, D.C. 20006
(202) 261 – 2883
(202) 261 – 2835 (facsimile)
soswald@employmentlawgroup.com
dscher@employmentlawgroup.com
*Counsel for Plaintiff Philip Layman*