IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| PHILIP LAYMAN, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. RDB-12-2860 |
| MET LABORATORIES, INC., | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Philip Layman ("Layman" or "Plaintiff") has brought this action against his former employer Defendant MET Laboratories, Inc. ("MET Labs" or "Defendant") for retaliation in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h). This is the second such action filed by Plaintiff. He originally filed a two-count complaint in Civil Action No. RDB-11-03139 alleging retaliation under the FCA and wrongful discharge in violation of Maryland law against MET Labs on November 3, 2011. In ruling upon MET Labs' motion to dismiss for failure to state a claim in the first action, this Court dismissed Layman's retaliation claim *without prejudice* and his wrongful discharge claim with prejudice.[1] Layman has now filed this second complaint alleging one count of retaliation under the False Claims Act for constructive discharge. Specifically, he claims that MET Labs took actions to induce his resignation after he refused to approve a report containing product testing results

---

[1] Layman appealed this Court's dismissal of the Maryland wrongful discharge count to the United States Court of Appeals for the Fourth Circuit, which in turn dismissed the appeal in *Layman v. MET Labs., Inc.*, No. 12-2213 (4th Cir. Dec. 17, 2012). The Fourth Circuit in a brief order noted that this Court's earlier dismissal order was neither a final order nor an appealable interlocutory or collateral order. *See id.*

1

for an Air/Hydraulic Pumping Unit which he believed to be fraudulent. According to Layman, the private company for which this report was created, Windward Inc., was a subcontractor for the United States government and the Pumping Unit was being tested for an eventual sale to the United States military.

Pending before this Court is Defendant's Motion to Dismiss for Failure to State a Claim (ECF No. 8) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Also pending is Plaintiff's Motion to File *Instanter* Surreply in Opposition to Motion to Dismiss (ECF No. 12). Defendant MET Labs has also filed two Notices of Supplemental Authorities (ECF Nos. 14 & 16) to which Plaintiff has objected (ECF Nos. 15 & 17). This Court has reviewed and considered all of the parties' submissions, objections and supplemental pleadings and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2011). Thus, Plaintiff Philip Layman's Motion for Leave to File *Instanter* Surreply (ECF No. 12) is GRANTED.[2] For the reasons that follow, Defendant MET Laboratories, Inc.'s Motion to Dismiss (ECF No. 8) is DENIED.

BACKGROUND

For the purposes of this motion, this Court accepts as true the facts alleged in the plaintiff's' complaint. *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011). Plaintiff Philip Layman ("Layman" or "Plaintiff") was employed by Defendant MET Laboratories, Inc. ("MET Labs" or "Defendant") from October 1, 1991 to July 14, 2011. Pl.'s Compl. ¶ 9,

---

[2] There is significant legislative history concerning Congress's intent in the enactment of the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, § 4, 123 Stat. 1617 (2009). While surreplies are generally not permitted, the Court may allow such a filing where the party shows a need for a surreply. *See* Local Rule 105.2 (D. Md. 2011); *Stoyanov v. Mabus*, No. 07-1764, 2009 WL 4884518, at *8 (D. Md. Dec. 9, 2009). Plaintiff has demonstrated a need for a Surreply and the Motion to File *Instanter* Surreply in Opposition to Motion to Dismiss (ECF No. 12) is GRANTED.

2

ECF No. 1. "MET [Labs] is an independent electrical testing and certification lab, specializing in testing various technological products during pre-market development." *Id.* ¶ 7. From 1991 to 2006, Layman worked as a test engineer for MET Labs' Environmental Simulation Lab ("ESL"). *Id.* ¶¶ 10-11. He was then promoted to the ESL Manager position in 2006. *Id.* ¶ 16. As ESL manager Layman "scheduled and assigned test engineers to perform product testing . . . assisted clients in developing, organizing and tailoring tests to be performed on a particular product . . . identified potential problems with products" and made recommendations. *Id.* ¶¶ 18-19. Additionally, he "researched and designed new testing capabilities for the environmental chambers . . . to make product testing more efficient." *Id.* ¶ 20. He also performed regular test engineer duties, such as "perform[ing], measur[ing] and record[ing] product testing" and he was responsible for "price quoting all ESL tests." *Id.* ¶¶ 22-23. Finally, "Layman supervised audits performed on the ESL equipment [to ensure] that MET continued to maintain its American Association for Laboratory Accreditation ("A2LA") certification"−an essential requirement imposed by several MET Labs clients. *Id.* ¶¶ 24-26. During that time, Layman's salary was approximately $100,000 per year. *Id.* ¶ 27.

In 2008, MET Labs built a dust chamber which "was [allegedly] riddled with problems" and constantly required repairs. *Id.* ¶¶ 28-36. "A dust chamber is designed to simulate a desert environment" and is used for product testing through the manipulation of the temperature, humidity and dust concentration levels. *Id.* ¶ 29. Although Layman initially recommended one company as the best company to build the dust chamber, Troy Franklin ("Franklin"), MET's Director and Layman's direct supervisor, ignored that recommendation

3

and chose another company. *Id.* ¶¶ 31-33. This later company's production cost estimate was approximately $30,000 less than the company recommended by Layman. *Id.* ¶ 34

In or around May 2011, Layman alleges that Windward Inc. ("Winward") hired MET Labs as a subcontractor to test a Pumping Unit ("Pumping Unit") in the dust chamber. *Id.* ¶¶ 37-39. According to Layman, the United States government had entered into a contract with Winward which required it "to furnish pneumatic powered hydraulic pumping units . . . for use by the United States military." *Id.* ¶ 37. In turn, Layman alleges that "MET [Labs] was subcontracted by Winward to subject the Pumping Unit to the MIL-STD-810E[3] Blowing Dust Test" in the dust chamber. *Id.* ¶ 39. However, Layman alleges that he did not "know the specific use or the military client associated with the Pumping Unit." *Id.* ¶ 40. Additionally, Layman claims that once MET Labs became the subcontractor, it received a "Letter of Delegation" from the United States government listing the testing requirements and assigning a Defense Contract Administration Services Quality Assurance Representative ("DCAS QAR"), Elliot Jenkins ("Jenkins"), "to serve as the military witness to approve the final testing report." *Id.* ¶¶ 42,44. According to Layman, DCAS QARs are generally assigned to projects involving "critical and significant military equipment contracted for sale to the United States" government. *Id.* ¶ 43.

Testing of the Pumping Unit in the dust chamber allegedly began on May 24, 2011. *Id.* ¶ 46. DCAS QAR Jenkins and Winward's President were allegedly present during these tests. *Id.* According to Layman, as the test engineers sought to perform the tests, the dust

---

[3] The Court takes judicial notice that the MIL-STD-810E is a "test method standard approved for use by all Departments and Agencies of the Department of Defense. Although prepared for DoD applications, this standard may be tailored for commercial applications as well." DEP'T OF DEF., MIL-STD-810E, *Foreword* to TEST METHOD STANDARD FOR ENVIRONMENTAL ENGINEERING CONSIDERATIONS & LABORATORY TESTS (1989), *available at* http://www.atec.army.mil/publications/Mil-Std-810E/810ECN3.pdf.

4

chamber was unable to "maintain the proper dust concentration levels" required. *Id.* ¶¶ 47. Attempts at repairing the dust chamber that day were unsuccessful and Layman claims that it continued to fail to "generate the correct dust concentration level" required to test the Pumping Unit. *Id.* ¶ 49. As a result, Layman alleges that DCAS QAR Jenkins directed the engineers to stop the tests. *Id.*

Throughout the following days, the test engineers allegedly continued their repair efforts but these were unsuccessful. *Id.* ¶ 51. Despite these failed attempts, Layman alleges that Franklin, his supervisor, ordered the test engineers to resume testing on May 27, 2011. *Id.* ¶¶ 51-52. Neither DCAS QAR Jenkins nor Winward's President were present. *Id.* ¶ 52. On that day, Layman claims that one of the test engineers discovered that the dust chamber's pressure sensor was clogged which had the effect of preventing accurate testing. *Id.* ¶¶ 53, 54. The test engineer then allegedly ordered a new sensor and continued to work on the dust chamber while he waited for the new sensor to arrive. *Id.* ¶ 55-56.

On May 31, 2011, the test engineers again resumed testing on the Pumping Unit. *Id.* ¶ 57. While the dust chamber was now allegedly able to maintain the appropriate dust concentration levels for low temperature tests, Layman claims that it failed again to maintain the necessary dust concentration for high temperature tests. *Id.* ¶¶ 57-58. As a result, that same day, Layman informed Franklin of the continued dust chamber issues and that he would not approve further test results until the dust chamber was successfully repaired. *Id.* ¶¶ 60-62. Despite this warning, however, Franklin allegedly instructed the test engineers to continue testing the Pumping Unit in the faulty dust chamber. *Id.* ¶ 64.

After Franklin decided to continue the tests over Layman's objections, Layman

5

alleges that he "began investigating the matter of the Pumping Unit." *Id.* ¶ 65. Specifically, he claims having asked Franklin why he continued the tests when he knew that the Pumping Unit could not be tested accurately in the dust chamber at the moment. *Id.* Layman also claims that at that time he reiterated that he would not sign the Pumping Unit report if "Franklin intended to claim that the Pumping Unit complied with testing standards and applicable military regulations." *Id.* ¶ 66. Franklin allegedly replied that Layman "would not have [his] signature on anything before long." *Id.* ¶ 67.

On June 2, 2011, Layman alleges that he noticed test engineers as they were in the process of altering the Pumping Unit's test results. *Id.* ¶ 70. Specifically, Layman alleges that they were engaged in the process of manipulating "test data to inaccurately convey that the Pumping Unit" was accurately tested. *Id.* ¶ 71. Moreover, Layman alleges that the method they were using was in explicit conflict with the method provided for by the MIL-STD-810E. *Id.* ¶ 73-74. However, when Layman informed them that they were "faking data," these engineers allegedly responded that they were following Franklin's orders. *Id.* ¶¶ 72, 76. Layman then alleges that he immediately confronted Franklin about the "fraudulent calculations" and that submitting a report claiming that the "Pumping Unit met all testing standards" would amount to committing fraud. *Id.* ¶ 78. Nevertheless, Layman alleges that Franklin submitted the report containing the fraudulent data to Winward a couple of days later. *Id.* ¶ 79. According to Layman, the final report included a representation that the MIL-STD-810E dust concentration requirement was satisfied. *Id.* ¶ 80. Additionally, Layman alleges that although he had not witnessed all the tests, DCAS QAR Jenkins approved and signed the report. *Id.* ¶ 81. Layman further alleges that he did not approve

6

the report because he believed that it would have "effectively induced the United States military to purchase equipment that did not meet testing standards." *Id.* ¶ 82.

About two weeks after the issuance of the final report, Layman alleges that he was informed that Franklin had solicited complaints about his work performance. *Id.* ¶¶ 85-88. A month later, on July 14, 2011, Layman claims that he was demoted to the position of Chief Technical Engineer which "entailed an approximate 15-20% pay cut, [and] no supervisory authority." *Id.* ¶¶ 89-94. Moreover, Layman claims that in said position he would have had to report to one of his former assistants and that it "allowed no opportunity for advancement." *Id.* ¶ 93. Additionally, he claims that he never reviewed the complaints filed against him and that in twenty years with MET Labs he had never received " a negative performance evaluation." *Id.* ¶¶ 92, 95. Finally, he claims that he resigned the same day and that his demotion amounted to a constructive discharge. *Id.* ¶ 95.

As a result, Layman filed his initial complaint before this Court alleging retaliation in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h) and wrongful discharge under Maryland law. *See Layman v. MET Labs., Inc.*, RDB-11-03139, 2012 WL 4018033 (D. Md. Sept. 12, 2012). This Court dismissed Layman's FCA claim without prejudice and his wrongful discharge claim with prejudice. *Id.* Although Layman sought an appeal of this Court's dismissal of his wrongful discharge claim in the United States Court of Appeals for the Fourth Circuit, that appeal was dismissed on December 17, 2012 noting that this Court's earlier dismissal of his FCA claim without prejudice was neither a final order or an appealable interlocutory order. *See Layman v. MET Labs., Inc.*, Case No. 12-2213 (4th Cir. Dec. 17, 2012). Layman has now filed the pending action before this Court reasserting his

7

retaliation claim under the False Claims Act.

## STANDARD OF REVIEW

"Unlike the fraud claim, a retaliation claim [under the False Claims Act] is not subject to the heightened pleading standard of Rule 9(b); therefore, plaintiff need only satisfy Rule 8's notice pleading requirements to survive a motion to dismiss." *United States ex rel. Elms v. Accenture LLP*, 341 Fed. App'x 869, 873 (4th Cir. 2009). Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted; therefore, "the purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). In ruling on such a motion, this Court is guided by the Supreme Court's instructions in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) which "require complaints in civil actions be alleged with greater specificity than previously was required." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). The Supreme Court's *Twombly* decision articulated "[t]wo working principles" courts must employ when ruling on Rule 12(b)(6) motions to dismiss. *Iqbal*, 556 U.S. at 678.

First, while a court must accept as true all the factual allegations contained in the complaint, legal conclusions drawn from those facts are not afforded such deference. *Id.* ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim.) Second, a complaint must be dismissed if it

does not allege "a plausible claim for relief." *Id.* at 679. Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Although the plausibility requirement does not impose a "probability requirement," *id.* at 556, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663; *see also Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 291 (4th Cir. 2012) ("A complaint need not make a case against a defendant or *forecast evidence* sufficient to *prove* an element of the claim. It need only *allege facts* sufficient to *state* elements of the claim.") (emphasis in original) (internal quotation marks and citation omitted). In short, a court must "draw on its judicial experience and common sense" to determine whether the pleader has stated a plausible claim for relief." *Iqbal*, 556 U.S. at 664.

## ANALYSIS

Defendant MET Laboratories, Inc. ("MET Labs" or "Defendant") essentially contends that this second action filed by Plaintiff Philip Layman ("Plaintiff" or "Layman") should be dismissed based upon this Court's earlier ruling in the previously filed action. However, this Court examines the sufficiency of the allegations in this second suit in the context of the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, § 4, 123 Stat. 1617 (2009), which amended the False Claims Act anti-retaliatory provisions set forth in 31 U.S.C. 3730(h). The United States Court of Appeals for the Fourth Circuit has recognized the significance of these amendments. *See Mann v. Heckler*, 630 F.3d 338, 343 n* (4th Cir. 2010); *United States ex rel. Parks v. Alpharma, Inc.*, 493 F. App'x

9

380, 387-88 (4th Cir. 2012). In the context of the pending motion to dismiss, the Plaintiff need only allege that (1) he engaged in activity protected by the statute; (2) his employer knew he engaged in protected activity; and (3) he was discharged because he engaged in protected activity. *See Eberhardt v. Integrated Design & Const., Inc.*, 167 F.3d 861, 866 (4th Cir. 1999); *Parks*, 493 F. App'x at 388; *United States ex rel. Patton v. Shaw Servs., L.L.C.*, 418 F. App'x 366, 371-72 (5th Cir. 2011).[4] As explained below, in enacting FERA, Congress has broadened the scope of the protected activity and notice prongs.

Defendant MET Labs contends that Layman's claims should be dismissed because he fails to allege (1) that he engaged in protected activity under the False Claims Act ("FCA"), and (2) that MET Labs knew that he engaged in protected activity. MET Labs does not contest that Layman has alleged that he was subjected to an adverse employment action. In response, Layman argues that he engaged in protected activity under Section 3730(h) as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, § 4, 123 Stat. 1617 (2009). Moreover, Layman contends that his allegations sufficiently allege that MET Labs had notice of his engagement in protected activity under the statute.

Preliminarily, the Court notes that the Fraud Enforcement and Recovery Act of 2009 ("FERA") amended 31 U.S.C. 3730(h) and this amendment affects "conduct on or after the date of enactment." Pub. L. No. 111-21, § 4(f), 131 Stat. 1617, 1625 (2009). The version of Section 3730(h) of the False Claims Act ("FCA") presently in effect states that:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened,

---

[4] The authorities cited by the defendant in supplemental briefing refer to opinions in the context of summary judgment motions. *See* ECF Nos. 15 & 17.

> harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).[5] As the alleged facts of this case occurred in 2011, this statute is applicable.

Section 3730(h) of the False Claims Act ("FCA"), or the "whistleblower provision," provides a relief mechanism to employees subjected to an adverse employment action by employers for their "efforts to prevent the employer from engaging in fraud on the federal government." *Manfield v. Alutiiq Int'l Solutions, Inc.*, 851 F. Supp. 2d 196, 201-02 (D. Me. 2012). Accordingly, the general requirements for stating a claim under Section 3730(h) of the False Claims Act ("FCA") have not changed. As mentioned above, Plaintiff must therefore allege that (1) he engaged in activity protected by the statute; (2) his employer knew he engaged in protected activity; and (3) he was discharged because he engaged in protected activity. *See Eberhardt*, 167 F.3d at 866; *Parks*, 493 F. App'x at 388; *Patton*, 418 F. App'x at 371-72. Plaintiff must also "allege fraudulent claims for federal funds and not merely address concerns about general misconduct." *Guerrero v. Total Renal Care, Inc.*, No. EP-11-CV-449-KC, 2012 WL 899228, at *5 (W.D. Tex. Mar. 12, 2012) (citing *inter alia Patton*, 418 F. App'x at 372 ("For internal complaints to constitute protected activity 'in furtherance of' a

---

[5] Prior to the FERA amendments, Section 3730(h) stated as follows:
> An employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms or conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

37 U.S.C. § 3730(h)(2008). While this Court relied on this pre-FERA language in its previous opinion dismissing Layman's FCA retaliation claim without prejudice, it is now clear that the post-FERA statute should be applied as the alleged facts in this case occurred after the enactment of FERA on May 20, 2009.

11

*qui tam* action, the complaints must concern false or fraudulent claims for payment submitted to the government.")). However, while the complaint must "allege fraud on the government," *United States ex rel. George v. Boston Scientific Corp.*, 864 F. Supp. 2d 597, 606 (S.D. Tex. 2012) (citations omitted), an employee is protected during his or her investigative efforts regardless of the ultimate guilt or innocence of the employer. *Guerrero*, 2012 WL 899228, at *5 (quoting *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 416 (2005)).

## I. Protected Activity

Prior to the enactment of FERA, the "protected activity" requirement of a FCA retaliation cause of action required that an employee take some action "in furtherance" of a *qui tam* suit. 31 U.S.C. § 3730(h)(2008). A plaintiff engaged in protected activity when he satisfied what has been termed the "distinct possibility" standard. *Mann*, 630 F.3d at 344. "Under this standard, protected activity occurs when an employee's opposition to fraud takes place in a context where 'litigation is a distinct possibility, when the conduct reasonably could lead to a viable FCA action, or when . . . litigation is a reasonable possibility.' " *Id.* (quoting *Eberhardt*, 167 F.3d at 869). Importantly, an employee's investigations regarding his employer were only protected if the investigation concerned false or fraudulent claims against the United States' government. *See Eberhardt,* 167 F.3d at 868; *Mann*, 630 F.3d at 345-46 ("The FCA's scope is commensurate with its purpose. It covers only fraudulent claims against the United States; without fraud, there can be no FCA action.").

When Congress enacted FERA, it did so to counter perceived restrictive judicial interpretations of the protected activity prong by extending protected acts to acts "in

furtherance of . . . other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1); *see also* H.R. Rep. No. 11-97, pt. 8, at 5 (2009) ("unfortunately, since the 1986 amendments were enacted, several court decisions have limited the reach of the False Claims Act, jeopardizing billions in Federal funds. . . . Since the 1986 amendments, courts have also limited the scope of the False Claims Act's anti-retaliation provisions."). Congress stated that the "language is intended to make clear that [§ 3730(h)] protects not only steps taken in furtherance of a potential or actual *qui tam* action, but also . . . taken to remedy . . . misconduct through methods such as internal reporting to a supervisor or company compliance department." 155 Cong. Rec. E1295-03, E1300 (daily ed. June 3, 2009). This is in contrast with pre-FERA standards pursuant to which protected activity did not include reporting to one's supervisor. *See e.g. Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 914 (4th Cir. 1997) ("Simply reporting his concern of a mischarging to the government to his supervisor does not suffice to establish that Zahodnick was acting 'in furtherance of' a *qui tam* action."). Nevertheless, "to constitute protected conduct, an employee's internal report must specifically allege fraudulent claims for federal funds and not merely address concerns about general misconduct." *Guerrero*, 2012 WL 899228, at *5 (citing *inter alia Patton*, 418 F. App'x at 372). Additionally, in defining claims, Congress not only included claims presented directly to the United States, but also claims presented "to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest . . . if the United States Government provides or has provided any portion of the money or property requested or demanded." 31 U.S.C. § 3729(b)(2).

Accordingly, while post-FERA courts continue to apply the distinct possibility standard, sufficiently pleading the protected activity prong of an FCA retaliation claim is subject to a broader standard. *See Brazil v. Ca. Northstate Coll. Of Pharmacy, LLC*, --- F. Supp. 2d ----, 2012 WL 5289330, at *1, 6 (E.D. Cal. 2012) (holding that an employee sufficiently alleged that he engaged in protected activity when he claimed having confronted a College's administration about its tuition practices and the possibility of civil and criminal government sanctions); *United States ex rel. Moore v. Cmty. Health Servs., Inc.*, No. 3:09cv1127, 2012 WL 1069474, at *8 (D. Conn. Mar. 29, 2012)(holding that an employee sufficiently pled that she engaged in protected activity when she alleged having been retaliated against after having "investigat[ed] and complained to . . . management . . . about what she perceived as fraudulent [Medicare and Medicaid] billing practices); *George*, 864 F. Supp. 2d at 606-07 (holding that an employee sufficiently alleged that she engaged in protected activity when she asked on two-separate occasions whether Boston Scientific's marketing of a device could be done legally and whether the government would view it as illegal).

In this case, Plaintiff Layman alleges that the United States government entered into a contract with Winward Inc. ("Winward") for the provision of hydraulic pumping units for use by the United States military. Layman then alleges that Winward entered into a subcontract with his former employer, Defendant MET Labs, to test one of these pumping units in its dust chamber. While Layman claims that he is not aware of the exact client, he alleges that the Pumping Unit was destined for use by the United States military. Layman also claims that one of the standards to be applied during the product testing was military standard MIL-STD-810E and that a "Letter of Delegation" sent by the government

appointed a Defense Contract Administration Services Quality Assurance Representative ("DCAS QAR"), Jenkins, to oversee the tests.

With respect to the product testing, Layman alleges that the dust chamber was faulty and that it did not permit accurate tests. Despite several repair attempts, the dust chamber allegedly continued to produce unsatisfactory test results throughout the testing dates. Regardless of these complications, Layman alleges that his supervisor submitted a report to Winward containing fraudulent calculations and certifying that the pumping unit met all the necessary requirements. Specifically, Layman claims his investigation allowed him to uncover that his supervisor had instructed the test engineers to use a fraudulent calculation method to prepare the report. Layman also claims that he informed both the test engineers and his supervisor that the calculations amounted to fraud on the government and that he would not sign the report. Moreover, he claims that the DCAS QAR approved the final report despite having only been present for one of the product testing days. Finally, Layman alleges that he was threatened and subsequently demoted after refusing to sign the report. Accordingly, Layman has sufficiently alleged that he engaged in protected activity under the False Claims Act.

As mentioned above, Congress has extended the definition of claim to claims made to a contractor or grantee where the government "provides or has provided any portion of the money or property requested or demanded." *See* 31 U.S.C. § 3729(b)(2)(a)(ii)(I). As such MET Labs contentions that the contract agreement between it and Winward is an agreement between private companies and that it does not contain any "subcontract" reference do not

disprove Layman's allegation that the United States government entered into a contract with Winward which in turn caused Winward to enter into a contract with MET Labs.

**II.     Notice**

The notice prong is related to the protected activity prong.  Prior to the enactment of the Fraud Enforcement and Recovery Act of 2009 ("FERA") an employee was required to allege facts which indicated that an employer had a sufficient amount of knowledge regarding that protected activity so as to be put on notice of the possibility of future *qui tam* litigation.  Specifically, the complaint must allege that "[t]he employer [had] knowledge of more than the employee's acts; the employer must have known that these acts raised a distinct possibility of a FCA suit."  *Glynn v. Impact Science & Tech., Inc.*, 807 F. Supp. 2d 391, 412-13 (D. Md. 2011), *aff'd sub nom. Glynn v. EDO Corp.*, 710 F.3d 209 (4th Cir. 2013) (citing *Yesudian v. Howard Univ.*, 153 F.3d 731, 744 (D.C. Cir. 1998)).   However, "the notice requirement would not be met until the employee expressed concerns about the likelihood of fraud to the employer."  *Eberhardt*, 167 F.3d at 869 n. 2.

Post-FERA, courts have continued to hold that internal reporting suffices to put the employer on notice as long as the employee "specifically [told] the employer that he is concerned about fraud."  *George*, 864 F. Supp. 2d at 608 (citation omitted) (holding that where an employee raised questions concerning the legality of off-label marketing, she had "adequately pleaded that the defendants were on notice of her protected activity.").  *Guerrero*, 2012 WL 899228, at * 7 ("[A]n employee may put her employer on notice of possible False Claims Act litigation by making internal reports that alert the employer to fraudulent or illegal conduct.").  Nevertheless, the United States District Court for the District of Maine

has held that "[s]ince a plaintiff now engages in protected conduct whenever he engages in an effort to stop an FCA violation, the act of internal reporting itself suffices as both the effort to stop the FCA violation and the notice to the employer." *Manfield v. Alutiig Int'l Solutions, Inc.*, 851 F. Supp. 2d 196, 204 (D. Me. 2012). Additionally, "[t]he Fourth Circuit allows for the first and second elements to be combined . . . [but] consider[s] the facts known to the employee at the time of the protected activity as well as the facts known to the employer at the time of the alleged retaliation." *Dillon v. SAIC, Inc.*, No. 1-12-CV-390, 2013 WL 324062, at *4 (E.D. Va. Jan. 28, 2013) (citing *Mann*, 630 F.3d at 344).

In this case, Layman has sufficiently pled that he engaged in protected activity under the statute. Additionally, he has alleged that he informed his supervisor that the test results were fraudulent and that he would not and did not sign the report. Accordingly, Layman has sufficiently pled the notice requirement. As a result, Defendant's Motion to Dismiss is DENIED.

## CONCLUSION

For the reasons stated above, Plaintiff Philip Layman's Motion for Leave to File *Instanter* Surreply (ECF No. 12) is GRANTED. Additionally, Defendant MET Laboratories, Inc.'s Motion to Dismiss (ECF No. 8) is DENIED. .

A separate Order follows.

Dated:   May 20, 2013         /s/_____
                              Richard D. Bennett
                              United States District Judge